# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 26, 2019 Session

## STATE OF TENNESSEE v. JUSTIN PATRICK KISER

### Appeal from the Criminal Court for Knox County
### No. 105153     Steven W. Sword, Judge

---

### No. E2018-00696-CCA-R3-CD

---

The defendant, Justin Patrick Kiser, appeals his Knox County Criminal Court jury convictions of facilitation of aggravated burglary and theft of property valued at $500 or less, arguing that the trial court erred by permitting the State's fingerprint expert to testify that another examiner had verified his conclusions; by admitting into evidence a document showing the work performed by the second, non-testifying analyst; and by denying his motion for a mistrial after the prosecutor relied on the verification of the non-testifying analyst during closing argument. He also claims that the evidence was insufficient to support his conviction of facilitation of aggravated burglary because the State failed to establish that he did not intend to promote or assist in the burglary or to benefit from its proceeds and that the trial court erred by denying his bid for judicial diversion. Discerning no reversible error, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Mark E. Stephens, District Public Defender; and Jonathan Harwell (on appeal) and Melissa Dirado (at trial), Assistant District Public Defenders, for the appellant, Justin Patrick Kiser.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme P. Allen, District Attorney General; and Randall Kilby, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Knox County Grand Jury charged the defendant with aggravated burglary and theft of property valued at $1,000 or more but less than $10,000 in relation to the burglary of and theft of items from the home of Phillip Crye on May 29, 2014.

At the June 2016 trial, Mr. Crye testified that his wife telephoned him on the day of the offense to let him know "that there had been a break-in at" their Knoxville residence. When he arrived home shortly thereafter, he saw that "the kitchen window had been broken open, and someone or some persons had come in through the kitchen window from a patio area into the kitchen and rummaged and rifled around through the house and took various items." He said that the perpetrator or perpetrators "had put a utility bar from the outside underneath the bottom sash and pried [the window] open which broke the lock off the sash." The perpetrator left through the back door.

Mr. Crye determined that three shotguns, jewelry that had belonged to his mother, a Bose CD/radio, a bag of foreign currency, a souvenir whiskey flask, his grandfather's pocket watch, and a Nook electronic reader had been taken during the burglary. He also noticed that a partially full box of wine and three or four beers had been taken from the refrigerator. Mr. Crye estimated the total value of the property taken to be $4,000.

Mr. Crye recalled that, during the initial investigation, he and the investigating officer saw handprints on the window that had been used as the point of entry. While the evidence technician lifted prints from the window, Mr. Crye "looked around some more, and to the end of the patio out from the kitchen window," he observed "a path beat down in some ivy where" it appeared that someone had entered his lot "from the back area of the Sharp house next door." Mr. Crye said that he thought he might have seen the defendant in the company of the Sharp's oldest son before the burglary and that he had definitely seen the defendant at the Sharp residence following the burglary. Mr. Crye said that he did not give the defendant or any other person permission to enter the house and take the items.

On the day after the burglary, Mr. Crye's wife telephoned Barnes and Noble to report that the Nook had been stolen. She telephoned the company again two days later and asked whether the device could be tracked. After that conversation, Mrs. Crye told Mr. Crye "that it had been registered on Friday, the day after the break-in, to some person named Justin in Knoxville" after an unsuccessful attempt to register it on the Thursday evening of the burglary.

During cross-examination, Mr. Crye said that he did not know the Sharp children well, and his only direct interaction with them had occurred approximately two weeks before the burglary when he helped the youngest boy catch his wayward puppy. Mr. Crye admitted that he told the police that he suspected that the Sharp boys had committed the offense, noting "the evidence [he] saw on the ground that went directly to the back of their house." He said that it was his understanding that the police had attempted to speak to the Sharps or their mother "but that she or they were not very cooperative."

Beth Goodman, who had previously worked as an evidence technician for the Knoxville Police Department ("KPD"), testified that she attempted to collect prints from the point of entry in the kitchen, in the bedrooms, and in a bathroom. Ms. Goodman "recovered latent prints from the exterior kitchen window, and there were no useable latent prints inside." She recovered a total of three usable palm prints from the exterior "bottom part of the window" and submitted those to the KPD fingerprint examiner.

KPD Investigator David Ogle, who investigated the burglary of the victim's home, testified that "it was pretty obvious that someone had at some point walked back and forth through the . . . decorative ivy right close to the point of entry." He said that the path through the ivy led directly from the victim's house to "the adjacent house where two young boys lived." Investigator Ogle obtained information about the Nook from the Cryes and then contacted Barnes and Noble. He learned that the defendant had registered the Nook using his own name, address, and bank card information. Investigator Ogle went to the defendant's residence and "asked him if he had possession of a Nook." The defendant admitted that he had the device and immediately turned it over to Investigator Ogle. Investigator Ogle confirmed that the device given to him by the defendant had the same serial number as the device taken from the Crye residence.

The defendant initially told Investigator Ogle "that he had found it on Craigslist and had met two individuals that were driving a small SUV in the Walmart parking lot of Halls and had paid $60 for the item." Investigator Ogle said that, based upon this information, he did not initially consider the defendant a suspect in the burglary. Investigator Ogle contacted the defendant again a few days later to come into the station to look at a photographic array. He said that, at that point, he believed that the Sharp boys had committed the burglary, and he wanted to see if the defendant would identify any of them as the person from whom he had purchased the Nook. Upon viewing two separate arrays, the defendant identified an individual named Lucas Kiley and the younger Sharp boy, Graham Sharp, as the individuals who sold the Nook to him.

After making the identifications, the defendant admitted that he had lied in his first statement to the police and apologized to Investigator Ogle. At that point, the

-3-

defendant prepared a written statement wherein he stated that he had purchased the Nook for $60 from "Lucas and Graham" and that he did not know it was stolen. The defendant said that he called Mr. Kiley and Graham Sharp after the police confiscated the Nook and that Mr. Kiley had told the defendant "that he had a gun and not to say anything." The defendant insisted that he lied in his original statement because he feared for his life.

Investigator Ogle testified that he still did not suspect the defendant and asked him to provide palm prints "so we could exclude him." The defendant agreed. After he received the report from the fingerprint examiner, Investigator Ogle attempted to contact the defendant several times, but the defendant did not answer his telephone and did not return Investigator Ogle's calls. During that time, Investigator Ogle also spoke with Ms. Sharp, who agreed to bring her sons in for questioning. When she did not arrive as scheduled for the interview, Investigator Ogle called her again, and she told him that "she was unable to get her sons to come to the police department, and that she couldn't do anything about it." When Investigator Ogle went to the Sharp residence in an attempt to speak to the boys, no one would answer the door.

During cross-examination, Investigator Ogle testified that shortly after the burglary, the victim sent him an email that contained the first and last names as well as the dates of birth and social security numbers for the Sharp boys. When asked whether he had told the defendant that a neighbor had identified him as having been at the Sharp residence, Investigator Ogle replied, "I said that someone had seen a red-headed boy at the Crye house, yes." He explained that it was his recollection that the victim had told him "that there had been a red-headed, orange-colored haired boy there at the house" and "that the next door neighbor had told [him] the same thing, that she'd seen [an] orange-haired boy there at the house, but nobody could identify him."

Certified fingerprint examiner Tim Schade testified as an expert in the area of fingerprint examination. Investigator Schade, a member of the KPD Forensics Unit, testified that he utilized a methodology called ACE-V, which stands for "analysis, comparison, evaluation, and verification," to make identifications in this case. In this case, Investigator Schade manually compared the palm prints collected by Ms. Goodman with the known palm prints obtained from the defendant on July 24, 2014, and he "was able to identify all three cards to [the defendant's] palm print." Investigator Schade identified coordinating yellow dots on the digitized copies of the palm prints collected from the scene and the defendant's known palm prints as "minutia points," explaining, "They're just corresponding points for each -- where the latent palm and the known palm [match]." He said that he found no dissimilarities between the recovered prints and the known prints that would have caused him to conclude that the prints did not belong to the defendant. Investigator Schade said that, *based upon his examination*, he concluded that the palm prints collected from the exterior of the kitchen window of the victim's house

belonged to the defendant. Investigator Schade testified that his conclusions were verified as part of the standard process followed by the KPD.

During cross-examination, Investigator Schade testified that no standard number of "minutia point" matches was required to make a positive identification. He added, "False positives [are] extremely rare, and it's incredibly rare whenever you have two competent fingerprint specialists looking at it to be able to verify it."

During redirect examination, Investigator Schade reiterated that the KPD took "the verification process very seriously," having "two or three people that verify those." He added that the quality of the palm prints obtained by Ms. Goodman was "really high."

The 20-year-old defendant testified that at the time of the offense, he was 18 years old and attending Central High School. He said that he was a friend of Peyton Sharp's and that on May 29, 2014, he visited Peyton Sharp at his residence. The defendant recalled that while he was visiting with Peyton Sharp, Graham Sharp and Mr. Kiley approached him and asked if he knew anyone who would like to buy a tablet. After the boys showed the defendant "a white Nook that had a case, charger, and had been wiped," he offered to buy the device. The defendant said that he looked on Craigslist to determine a fair value and that he paid $60 to Mr. Kiley for the device. The defendant said that when he received the Nook from Mr. Kiley, "[e]very bit of the data had been erased off of it. It was in factory reset. It was ready to be set up for a new user." The defendant testified that, after buying the Nook from Mr. Kiley, he charged the device overnight and then, on the following morning, he registered the device by putting his information on it and attaching his bank card information to the device for purchases. He said that he purchased and downloaded "one or two of the Harry Potter books."

The defendant said that he did not suspect "that there was anything wrong with" the Nook until "the investigator showed up at [his] house." He said that immediately after Investigator Ogle asked about the Nook, he "unplugged the Nook, grabbed the charger and everything [he] had for it, and . . . handed it straight to them." The defendant testified that he telephoned Peyton Sharp immediately after Investigator Ogle left his house with the Nook. Peyton Sharp put Graham Sharp on the telephone; Mr. Kiley was with them. The defendant said that after he "told them what all was going on and everything," Mr. Kiley told him that if he implicated them in the theft of the Nook, Mr. Kiley "had a .38 special, and then he also had other guns." The defendant claimed that he thought he had previously seen Mr. Kiley with a gun, and he "knew that Graham and Lucas both liked to fight a lot."

-5-

The defendant testified that Investigator Ogle called him to come to the police department to view a photographic lineup. He said that he identified a photograph of Graham Sharp from that first lineup. Investigator Ogle asked him to view another lineup on a later date, and he identified a photograph of Mr. Kiley from that second lineup. The defendant said that he told Investigator Ogle that he had purchased the Nook from Mr. Kiley. At that point, the defendant admitted to Investigator Ogle that he had previously lied about where he got the Nook, saying that he did so because he was scared. The defendant claimed that when he eventually expressed his fear of Graham Sharp and Mr. Kiley to Investigator Ogle, the investigator told the defendant that he would not have let somebody around that size threaten him. The defendant said that, on their last meeting, Investigator Ogle took him to be fingerprinted, and he "thought it was to try and clear" him. He maintained that he had never been to the Crye residence and that there was no reason his palm print should have been on the window.

Based upon this evidence, the jury convicted the defendant of the lesser included offenses of facilitation of aggravated burglary and theft of property valued at $500 or less. The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant challenges the admission of certain evidence, the sufficiency of the convicting evidence, and the propriety of the sentence imposed.

## I. Fingerprint Evidence

The defendant first asserts that the trial court erred by admitting Investigator Schade's testimony regarding the verification of Investigator Schade's conclusion that the palm print obtained from the exterior window of the Crye residence belonged to the defendant and by admitting into evidence documents prepared by the verifying examiner who did not testify at trial. The defendant argues that both the testimony and the documents were inadmissible hearsay and that both violated the Confrontation Clause. The State avers that Investigator Schade's testimony was not hearsay and did not violate the Confrontation Clause. The State concedes that the documents prepared by the verifying examiner should not have been admitted into evidence but argues that the error was harmless beyond a reasonable doubt.

During direct examination, Investigator Schade explained the ACE-V methodology:

It's analysis, comparison, evaluation, and verification. So first we analyze the print to determine whether it's of quality to be identified. Then we'll do an actual comparison, and then through that comparison, do an evaluation to

> determine whether there's enough . . . detail in the known print and latent print to be able to individualize that print. Then we have a verification process where . . . we'll have somebody verify the print afterwards.

He said that it was the practice of fingerprint examiners at KPD to examine prints "at least twice. Sometime three times" before making an identification. Investigator Schade identified "three sets of documents" that included the comparison that he performed, which was marked with yellow dots, and the "verifications from other people." At that point, the defendant objected to "anything that the certifying expert also did in this process," and the court ruled that Investigator Schade could testify that the certification process was followed in this case but could not relate any conclusion made by the reviewing examiner. Thereafter, Investigator Schade agreed that another person had verified his comparison in this case. The State sought admission of the original fingerprint card prepared by Investigator Schade that contained the defendant's fingerprints as well as "the three comparison cards."

The record establishes that the "three comparison cards" are the enlarged digitized copies of the palm prints recovered from the scene presented side-by-side with the corresponding portion of the defendant's known prints obtained by Investigator Schade. Each was entered as a separate exhibit, and each exhibit is two pages. The first page of each exhibit illustrates the comparison performed by Investigator Schade, with his comparisons marked in yellow. The second page of each illustrates comparisons made by another individual, presumably the person who verified Investigator Schade's work, with those comparisons marked in red. Although the defendant initially objected to the admission of the exhibits, he did so on grounds that the State had failed to lay a sufficient foundation "in terms of . . . what sort of computer system is used? Is it a database? How are those parts selected, and what goes into making that?" The trial court clarified that the exhibits "were manual comparison" and that none of "the computer stuff" would be admitted. The defendant made no further objection.

During cross-examination, in response to the defendant's line of questioning about the accuracy of fingerprint identification, Investigator Schade said that misidentification of fingerprints was "incredibly rare" when "two competent fingerprint specialists" are "looking at it to be able to verify it."

During redirect examination, Investigator Schade, in response to the State's question about the reliability of fingerprint examination, stated,

> Whenever we have two or three people that verify those, and I mean, we take the verification process very

-7-

seriously. It's -- you know, if we have an AFIS print, . . . what we're doing is doing a blind verification where you're looking at it, you're comparing it to whatever is there without knowing the results of which one was identified. So you have that blind verification.

During closing argument, the State mentioned Investigator Schade's fingerprint identification and noted its importance in the case but made no specific reference to the verification procedure. The defendant, however, emphasized the verification procedure during his closing argument:

The fourth step he told you about was verification, and he spent a lot of time talking about how verification was the most important step. If that was done in this case, the [S]tate did not give you that information, and you did not hear from the person who verified Mr. Schade's work. . . .

No one else was able to tell you if his work was appropriate, if it was accurate, if it was complete. That was Mr. Schade's interpretation of his job. . . .

. . . . He said there's a lot of dots that I'm able to compare, but no one came in to say, 'Yeah, I agree. Those dots match.' He put dots on a screen and said close enough. . . .

During rebuttal, the prosecutor stated that "these prints were verified" and classified the defendant's argument otherwise as "a misstatement of the evidence." The prosecutor added:

Investigator Schade testified that it's part of the procedure to have another investigator verify a fingerprint comparison. He testified that was done in this case. You can see the initials and the check of the person who verified those prints. She's not available, 'cause she moved to North Carolina.

The defendant objected, saying, "That was the whole reason I objected while Mr. Schade was testifying. Those prints were -- we never heard anything about the verification process other than -- it was maybe done." The court agreed with the defendant's characterization of the evidence and sustained the objection, admonishing the prosecutor to "just move on -- instead of harping on that." The prosecutor then stated, "Anyway he .

-8-

. . did testify that those prints were verified, that . . . the procedure was followed, and I'll just end by talking again about Mr. Kiser's credibility."

Following the jury charge, the defendant moved for a mistrial on the basis of the "mention of the verification process." The defendant argued that this mention, when "the verification process was not addressed to the jurors during the course of the trial," violated the Confrontation Clause and undermined "the fundamental fairness of this trial." As an alternative to the granting of a mistrial, the defendant asked the trial court "for a very strong curative instruction to the jury to disregard anything about the verification process being completed by someone who's not here." The trial court noted its earlier ruling that Investigator Schade would be permitted to testify "to the steps that they take, including having somebody verify it" and observed that no proof was admitted "about what the results of that verification was." The court stated that it had sustained the defendant's objection during the State's rebuttal because it "didn't want to focus on what that person may have said." The court denied the defendant's motion for a mistrial but agreed to provide a curative instruction. The court recalled the jury into the courtroom and provided the following instruction:

> Welcome back, folks. After you left, the attorneys discussed a matter with me that they felt like probably needed some clarification. I thought that was a good idea.
>
> So you may remember when [the prosecutor] was making his rebuttal argument he talked about verification process on the fingerprints, and the attorneys approached the bench. There was an objection made about that, and I want to clarify, I was sustaining that objection. So you're not to consider any statements made about what this other person other than Mr. Schade may have said. Mr. Schade was allowed to testify that it went through the verification process, but there's no other witnesses, you've heard no other testimony about what any other person's findings were. So all you can consider is what Mr. Schade said about the verification process. You are to disregard any statements made about any other person or what they may or may not have said. Okay? Does that make sense to you[?]

All of the jurors affirmatively indicated that they understood the trial court's instruction.

In his motion for new trial, the defendant argued that the trial court erred by permitting Investigator Schade to testify "regarding the verification step of the fingerprint

identification process," claiming that, although the testimony was "objected to and sustained," it "was still heard by the jurors," which violated the defendant's right to confrontation.

As indicated, the defendant now contends that both Investigator Schade's testimony regarding the verification process and the documents reflecting the work product of the non-testifying examiner violated the rule against hearsay as well as the Confrontation Clause.

*A. Hearsay*

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay.

Our supreme court has confirmed that "[t]he standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to de novo review." *Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see also Gilley*, 297 S.W.3d at 760 (stating that because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law"). "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Kendrick*, 454 S.W.3d at 479; *see also Gilley*, 297 S.W.3d at 760-61.

*Investigator Schade's Testimony*

Investigator Schade testified that he followed the ACE-V methodology and that his identification of the defendant's palm print had been verified. Verify means "to prove or confirm the truth of," *verify*, WEBSTER'S NEW DICTIONARY (2013), or "to show to be true; authenticate," WEBSTER'S ENGLISH DICTIONARY (2010). The term is derived from the Latin root "verus," which means "true," combined with the Latin "facere,"

which means "to make." ONLINE ETYMOLOGY DICTIONARY, https://www.etymonline.com (last visited April 23, 2019). Thus, to say that a conclusion has been verified is to say that the conclusion has been deemed true or accurate. Given this definition, Investigator Schade's statement that his identification of the palm print in this case had been verified necessarily conveyed an affirmative statement that another expert had deemed his conclusions true or accurate. Because the verifying examiner did not testify, this affirmative statement of accuracy belongs to an out-of-court declarant, thus creating the potential for hearsay and Confrontation Clause problems.

Courts across the country have wrestled with the admission of testimony and other evidence regarding the verification step in the ACE-V methodology when the verifying expert does not testify at trial precisely because such evidence has imbedded within it the findings and conclusions reached by an expert who is not subject to cross-examination.

In *Commonwealth v. Fulgiam*, the Massachusetts Supreme Court reviewed a claim that the trial court erred by permitting a fingerprint analyst "to testify that another fingerprint analyst had reviewed her work." *Commonwealth v. Fulgiam*, 73 N.E.3d 798, 821-22, as amended (Mass. 2017), *cert. denied sub nom. Fulgiam v. Massachusetts*, 138 S. Ct. 330 (2017). The *Fulgiam* court determined that the challenged testimony did not constitute inadmissible hearsay because "the analyst testified as to the ACE-V process" but "did not testify as to the second analyst's independent conclusions." *Id.* at 821. The court contrasted the analyst's testimony in Fulgiam's case with that offered by an analyst in an unrelated case who "testified that two secondary analysts 'concurred' with his conclusions regarding individualization." *Id.* (citation omitted). The latter testimony, the court concluded, did contain inadmissible hearsay in the form of the other analysts' conclusions. *Id.* The Massachusetts Supreme Court cautioned that courts "must use caution in allowing testimony regarding the verification step in ACE-V analysis, as 'verifying' suggests that a nontestifying expert concurs with the testifying expert's conclusion. Such testimony would be improper hearsay testimony." *Fulgiam*, 73 N.E.3d at 821 (citing *Commonwealth v. Chappell*, 40 N.E.3d 1031 (2015)).

Like the Massachusetts Supreme Court, the New Hampshire Supreme Court found error when the testifying analyst "did not merely testify that all four steps of this procedure had been followed" but "described the verification process[] and the results of the verification." *State v. Connor*, 937 A.2d 928, 930 (N.H. 2007). The court observed that, "[b]y its very nature, the purpose of this verification . . . lies in the truth of [the verifying examiner's] opinion, that is, that her independent ACE procedure resulted in the same conclusion, thus corroborating [the other examiner's] opinion." *Id.* at 931. The court found that, when testimony extends beyond "compliance with procedure," it constitutes hearsay that would not be admissible in the absence of an applicable

-11-

exception to the hearsay rule. *Id.* Following similar logic, other state courts to consider the issue have determined that testimony that the ACE-V procedure was followed does not constitute inadmissible hearsay or violate the Confrontation Clause but that testimony that the specific identification in a particular case was verified by another examiner is inadmissible. *See, e.g., People v. Pearson*, 116 N.E.3d 304, 311 (Ill. App. Ct. 2019) (concluding that testimony that a non-testifying examiner "concurred with the verification and the correct markings" "was hearsay in that [the non-testifying examiner's] verification was an out-of-court statement and it was offered to prove the truth of the matter asserted"); *Bond v. State*, 925 N.E.2d 773, 781 (Ind. Ct. App. 2010) (finding no error when fingerprint analyst "said that the ACE-V protocol was followed" but "the absent examiner's results were never referenced"); *State v. Smith*, 628 N.E.2d 1176, 1181 (Ill. 1994) (deeming fingerprint expert's testimony that his conclusion was verified by another examiner inadmissible hearsay); *State v. Wicker*, 832 P.2d 127, 128-30 (Wash. Ct. App. 1992) (same).

In our view, the logic employed by these courts is sound. The potential for hearsay, and, by extension, Confrontation Clause violations is mitigated when an analyst provides a simple explanation of the ACE-V methodology accompanied by a statement that the methodology was used in a particular case. When, as here, the expert goes further to indicate that the particular identification has been verified by another examiner, problems arise. That is because the import of a statement that the identification has been verified is that the identification has been deemed correct by an expert who reached the same conclusion. Moreover, the value of the verification lies in its truth. The State essentially gets two expert opinions from the testimony of one testifying expert. Thus, we conclude that Investigator Schade's testimony that another fingerprint examiner had "verified" his identification of the defendant's palm print was hearsay.

Even hearsay evidence, however, may be revealed to the jury when it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" and "the court determines that [its] probative value in assisting the jury to evaluate the expert's opinion substantially outweighs [its] prejudicial effect." Tenn. R. Evid. 703. Evaluating verification testimony in light of New Hampshire Rule of Evidence 703, which is nearly identical to Tennessee Rule of Evidence 703, the New Hampshire Supreme Court held that such evidence would not be admissible pursuant to that rule because a testifying analyst does "not rely upon [the non-testifying analyst's] verification as a basis for his opinion; it was simply a necessary prerequisite to the release of his already formed opinion." *Connor*, 937 A.2d at 931.

Conversely, when faced with a similar situation, the North Carolina Supreme Court found that testimony regarding the non-testifying analyst's opinion, though hearsay, was admissible pursuant to North Carolina Rule of Evidence 703. *State*

*v. Jones*, 368 S.E.2d 844, 848 (N.C. 1988). Similarly, the Georgia Supreme Court ruled that "testimony that another examiner had 'verified' the work of" the testifying examiner was not hearsay because it "tended to show that [the testifying examiner] had followed a standard and accepted methodology in her field of expertise, and the verification to which [she] testified, therefore, formed a basis for her own expert opinion." *Jarnigan v. State*, 761 S.E.2d 256, 260 (Ga. 2014). Citing other Georgia cases as precedent, the court stated that "testimony merely about the fact of 'verification,' not about the details of the verification process or the independent conclusions of the verifying examiner—was properly admissible to explain the basis for the opinion of the testifying examiner, which is not hearsay." *Id.* (citations omitted). In this state, however, evidence admissible pursuant to Rule 703 as forming the basis of an expert opinion is deemed admissible not because it is not hearsay but *despite* that it is hearsay.

In this case, Investigator Schade did not testify that he relied on the conclusions reached by the verifying examiner in forming his opinion in this case. To the contrary, Investigator Schade emphasized that both he and the second examiner conducted sequential, independent manual comparisons of the prints in this case. The State does not assert Rule 703 as an avenue of admission for Investigator Schade's statement, and the evidence adduced at trial does not support admission of this evidence via Rule 703.

Our conclusion that Investigator Schade's statement that the non-testifying examiner verified his identification was hearsay does not end our inquiry. Instead, we must assess the harmful effect of the error.

Interestingly, the trial court, following the defendant's objection, attempted to limit Investigator Schade's testimony to a statement that he had followed the ACE-V procedure in this case. After the trial court made its ruling, the State asked Investigator Schade if his conclusions in this case had been verified, and he replied in the affirmative. The defendant did not object to this statement. Investigator Schade did not provide a detailed description of the non-testifying analyst's findings. No further mention of the verification was made until cross-examination when Investigator Schade referenced the verification procedure in a general discussion of the reliability of fingerprint identifications. He then made a similar statement during redirect examination. The defendant, however, can be credited with drawing the most attention to the verification procedure testimony. Defense counsel essentially made the verification procedure a lynchpin of her closing argument and asserted, erroneously, that Investigator Schade had not testified that he followed the verification procedure or that his results had been verified in this case. When the State attempted to correct the misstatement during rebuttal, the defendant objected, and the trial court sustained the objection. The trial court then provided a specific and forceful curative instruction on how to treat evidence

regarding the verification procedure. Most importantly, the most damaging testimony, Investigator Schade's own identification of the defendant's palm print and the defendant's possession of the recently stolen Nook, was not impacted by the inadmissible hearsay. Finally, although the evidence against the defendant could not be classified as overwhelming, it was certainly more than sufficient. Under these circumstances, it is our view that the error was harmless.

*Exhibits*

The State concedes, and we agree, that those portions of exhibits 19, 20, and 21 that were prepared by the non-testifying fingerprint examiner were inadmissible hearsay. The State argues, however, that admission of these exhibits was harmless beyond a reasonable doubt. Again, we agree with the State. It was not clear at the time of their admission that these documents contained the work product of the non-testifying examiner, which is why, we suspect, that the defendant did not object to their admission. None of the documents states any particular conclusion and instead consists of colored dots superimposed over fingerprints. Although the State briefly mentioned the verification documents during closing argument, the defendant objected, and the trial court sustained the objection. Moreover, even without the inadmissible evidence, Investigator Schade's testimony linking the defendant to the Crye residence via the palm print remained, rendering the challenged documents cumulative.

## B. Confrontation Clause

The Sixth Amendment to the federal constitution and article I, section 9 of the Tennessee Constitution afford the criminal accused the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Although the provisions are not coterminous, our supreme court has "expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment." *State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014) (citing *State v. Parker*, 350 S.W.3d 883, 898 (Tenn. 2011); *State v. Franklin*, 308 S.W.3d 799, 809-10 (Tenn. 2010); *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008); *State v. Lewis*, 235 S.W.3d 136, 145 (Tenn. 2007)). In *Crawford v. Washington*, the United States Supreme Court departed from decades-long precedent and held for the first time that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* Because the Confrontation Clause does not bar nontestimonial hearsay, *see Davis v. Washington*, 547 U.S. 813, 823-24 (2006); *Whorton v. Bockting*, 549 U.S. 406, 420 (2007), "the threshold question in every case where the Confrontation Clause is relied upon as a bar to

the admission of an out-of-court statement is whether the challenged statement is testimonial." *Dotson*, 450 S.W.3d at 63 (citing *Cannon*, 254 S.W.3d at 301).

The *Crawford* court identified, for illustrative purposes, a "core class of 'testimonial' statements": "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51-52 (alteration in original) (citations omitted). Similarly, the court observed that some "statements . . . by their nature were not testimonial," including, among other things, "business records." *Id.*; *Dotson*, 450 S.W.3d at 64. The Supreme Court has also recognized that "medical reports created for treatment purposes . . . would not be testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 n.2 (2009); *see also Cannon*, 254 S.W.3d at 303 (statements in medical records given for the primary purpose of medical diagnosis and treatment are nontestimonial). Thus, statements that are properly categorized as business records or medical records are nontestimonial, and the Confrontation Clause has no application to their admission into evidence. *Cannon*, 254 S.W.3d at 303.

For those statements that are not easily classified as nontestimonial, our supreme court has concluded that "a statement is testimonial at least when it passes the basic evidentiary purpose test plus either the . . . targeted accusation requirement" adopted by the plurality of the Supreme Court in *Williams v. Illinois*, 567 U.S. 50 (2012), or the "formality criterion" espoused by Justice Thomas in his concurring opinion in *Williams*, stating that "[o]therwise put, . . . an out-of-court statement is testimonial . . . if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character." *Dotson*, 450 S.W.3d at 69 (quoting *Young v. United States*, 63 A.3d 1033, 1043-44 (D.C. 2013)).

As indicated, Investigator Schade's testimony that another analyst had verified his identification of the defendant's palm print necessarily included that analyst's statement that Investigator Schade's identification was accurate or true. Moreover, there can be no serious question but that the primary purpose of the analyst's verification as well as the documents associated with it was evidentiary and that it was a targeted accusation. Consequently, both the statement and the documents qualified as testimonial under the loose framework announced in *Williams* and adopted in *Dotson*. Because the verifying analyst did not testify at trial, the defendant's Confrontation Clause rights were implicated.

That being said, for the reasons discussed more fully above, it is our view that the admission of this testimony was harmless beyond a reasonable doubt. *See Coy v. Iowa*, 487 U.S. 1012, 1021 (1988) ("We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis, *see e.g., Delaware v. Van Arsdall*, 475 U.S. [673, 679, 684 (1986)], and see no reason why denial of face-to-face confrontation should not be treated the same.").

## *C. Motion for Mistrial*

In a related issue, the defendant asserts that the trial court erred by denying his motion for mistrial when the State referred to the non-testifying analyst's verification as substantive evidence during closing argument. The State asserts that the curative instruction provided by the trial court cured any error.

We find no abuse of discretion in the trial court's decision to deny the defendant's motion for mistrial. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

The trial court sustained the defendant's objection to the challenged argument and instructed the jury that it was "not to consider any statements made about what this other person other than Mr. Schade may have said" and "to disregard any statements made about any other person or what they may or may not have said." We must presume that the jury followed the instructions from the trial court. *See State v. Cribbs*, 967 S.W.2d 773, 784 (Tenn. 1998). Under these circumstances, nothing indicated a manifest necessity for the declaration of a mistrial, and the trial court's decision to deny the motion did not result in a miscarriage of justice. *See Saylor*, 117 S.W.3d at 250.

## *II. Sufficiency*

The defendant next asserts that the evidence was insufficient to support his conviction of facilitation of aggravated burglary, arguing that the State failed to establish that he "participated in the burglary but lacked any intent to promote the burglary or to

benefit in the proceeds or results of the burglary." Essentially, the defendant contends that because the evidence established that he did participate in and benefit from the proceeds of the burglary, the evidence was sufficient to support a conviction of the charged offense of aggravated burglary but insufficient to support his conviction of the lesser included offense of facilitation of aggravated burglary. The State avers that the evidence was sufficient.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

The defendant was originally charged with aggravated burglary, which as charged in this case, is the knowing entry into a habitation as defined by Code section 39-14-401 without the victim's consent and with the intent to commit a theft therein. *See* T.C.A. § 39-14-402(a)(1); -403(a). He was convicted, however, of the lesser included offense of facilitation of aggravated burglary. "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-403(a). The intent required for criminal responsibility under Code section § 39-11-402 is the "intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense." *Id.* § 39-11-402(2). This court has explained:

> Before an accused can be convicted of the facilitation of a felony, the state must prove beyond a reasonable doubt that the accused (a) knew another person was going to commit a specified felony and (b) knowingly furnished substantial

-17-

assistance in the commission of the felony although the accused did not possess the requisite intent to be guilty of the felony. In other words, the state must prove the commission of a specified felony and the assistance the accused gave to the person committing the specified felony.

*State v. Parker*, 932 S.W.2d 945, 951 (Tenn. Crim. App. 1996).

We note initially that the defendant requested an instruction on facilitiation of aggravated burglary, and the trial court agreed that the instruction was appropriate, explaining,

As far as facilitation of aggravated burglary goes, I think it makes sense. I mean, [the defendant] testified that the Sharps were over there. He got this Nook either from Graham Sharp or from Lucas Kiley, and Mr. Crye testified that he suspected that it was the Sharps, and that there was a line through the . . . ivy. So it's possible, I think, for somebody to look at that evidence and say that it would support, that maybe he provided the assistance by opening the window, but didn't intend to do anything else and left. So I think that's appropriate, and it's a well taken request. I'm going to instruct on facilitation of aggravated burglary.

In the light most favorable to the State, the evidence adduced at trial supported a conclusion that the defendant helped someone else break into the Crye residence but did not intend to enter the residence or benefit from the entry. The evidence established that the defendant was present on the exterior of the Crye residence and that he placed his hand on the window that was used as the point of entry for the burglary. Other evidence established that the defendant possessed the stolen Nook device and that it came into his possession within hours of the burglary. We disagree with the defendant that the jury had no choice but to conclude that, because he actually benefited from the proceeds of the burglary, he necessarily intended to do so. Importantly, as the judge of "the law and the facts," the jury is free to accept or reject any evidence "no matter how uncontroverted or uncontested a particular fact or element may appear." *State v. Thorpe*, 463 S.W.3d 851, 862-63 (Tenn. 2015) (quoting *State v. Richmond*, 90 S.W.3d 648, 660 (Tenn. 2002)) (internal quotation marks omitted). Accordingly, we conclude that the jury could have reasonably inferred from the evidence that the defendant provided substantial assistance in the burglary by opening the window but that he did not originally intend to benefit from the proceeds of the burglary. Consequently, the evidence was sufficient to support the defendant's conviction.

-18-

### III. Judicial Diversion

Finally, the defendant asserts that the trial court erred by denying his bid for judicial diversion, claiming that the trial court failed to engage in "the kind of reasoned and explained analysis required by precedent." He also argues that the trial court violated his privilege against self-incrimination by relying on the defendant's own admission of drug use as a basis for denying diversion. The State contends that the trial court did not err.

"Judicial diversion" is a reference to the provision in Tennessee Code Annotated section 40-35-313(a) for a trial court's deferring proceedings in a criminal case. *See* T.C.A. § 40-35-313(a)(1)(A). Pursuant to such a deferral, the trial court places the defendant on probation "without entering a judgment of guilty." *Id.* To be eligible or "qualified" for judicial diversion, the defendant must plead guilty to, or be found guilty of, an offense that is not "a sexual offense or a Class A or Class B felony," and the defendant must not have previously been convicted of a felony or a Class A misdemeanor. *Id.* § 40-35-313(a)(1)(B)(i)(b), (c). Diversion requires the consent of the qualified defendant. *Id.* § 40-35-313(a)(1)(A). "[A] 'qualified' defendant is not necessarily entitled to diversion. Whether to grant judicial diversion is left to the discretionary authority of the trial courts." *State v. King*, 432 S.W.3d 316, 326 (Tenn. 2014). Following a determination that the defendant is eligible for judicial diversion, the trial court must consider

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.

*Id.* (quoting *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)). "Further, the trial court must weigh the factors against each other and place an explanation of its ruling on the record." *King*, 432 S.W.3d at 326 (citing *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998)). The trial court need not provide a recitation of all the applicable "factors when justifying its decision on the record in order to obtain the presumption of reasonableness," but "the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it." *King*, 432 S.W.3d at 327.

Although judicial diversion is not a sentence, our supreme court has determined that the standard of review first expressed in *State v. Bise*, applies to "appellate review for a trial court's sentencing decision to either grant or deny judicial diversion." *King*, 432 S.W.3d at 325; *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012) (holding that the standard of review of the trial court's sentencing determinations is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act"). Importantly, the court emphasized that the adoption of the *Bise* standard of review "did not abrogate the requirements set forth in *Parker* and *Electroplating*, which are essential considerations for judicial diversion." *King*, 432 S.W.3d at 326. Thus, when the trial court considers each of the factors enumerated in *Parker* and weighs them against each other, placing its findings in the record, as required by *Electroplating, Inc.*, we "apply a presumption of reasonableness," per *Bise*, and will "uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *Id.* When "the trial court fails to consider and weigh the applicable common law factors, the presumption of reasonableness does not apply and the abuse of discretion standard . . . is not appropriate." *Id.* Instead, "the appellate courts may either conduct a de novo review or, if more appropriate under the circumstances, remand the issue for reconsideration. The determination as to whether the appellate court should conduct a de novo review or remand for reconsideration is within the discretion of the reviewing court." *Id.* at 328.

At the sentencing hearing, the State indicated that it would not object to a judicial diversion placement if the defendant was deemed eligible for judicial diversion. The defendant asked for diversion, claiming that he was eligible under the terms of Code section 40-35-313 despite having a prior misdemeanor conviction because his sentence in the former case did not include confinement. The defendant also noted that he had been deemed eligible for judicial diversion by the Tennessee Bureau of Investigation. The defendant also highlighted his full-time employment and amenability to drug treatment as factors favoring a judicial diversion placement.

The trial court observed that the defendant did not have an extensive criminal record but that the defendant was "somebody who's encountered the criminal system before," noting that the defendant had garnered misdemeanor convictions after the offense in this case. The court also questioned the defendant's "amenability to correction because of the direction his life has been going lately," noting that the defendant had "had encounters with juvenile court and continued on into his adulthood, engaging in this criminal type -- mostly minor criminal behavior, but still didn't get his attention." The court observed that the circumstances of the offense were not so "terribly egregious" as to "warrant denial of judicial diversion." Describing the defendant's social history, the court said,

His social history is kind of a mixed bag. I'm probably mostly concerned with his daily use of marijuana. I think that that gives me very strong concerns about his ability to be successful on either diversion or probation, and there's nothing wrong with his physical or mental health. He can be a productive citizen if he sort of gets his life together.

The trial court found that there was "nothing about deterrent value toward the community or the defendant that I think warrants denial of diversion." Finally, the court considered "whether judicial diversion will serve the interest of justice for the public and defendant," finding, "that's just sort of a mixed bag, considering a lot of things I've just -- I've read." The court concluded:

If Mr. Kiser was standing before me with a clean criminal history and didn't have such a long continued use of marijuana even after treatment, I would be much more inclined to grant judicial diversion, but that's not the case here. He's continued to engage in this kind of stupid, immature behavior, and it's got him caught up finally with a felony, and I'm not going to protect him from the consequences of those actions.

And so I'm going to give you probation, Mr. Kiser, but I don't believe the interest of justice be served by granting you diversion in this case.

Contrary to the defendant's assertion, the record reflects that the court considered each of the factors enumerated in *Parker*, that the court weighed those factors against each other, and that the court placed sufficient findings in the record as required by *Electroplating, Inc. See King*, 432 S.W.3d at 327. Accordingly, we "apply a presumption of reasonableness" to the denial of judicial diversion in this case. *See id.*

As an initial matter, we consider the defendant's claim that the trial court violated his privilege against self-incrimination by relying on his admission of marijuana use in the presentence report. The State argues that the defendant has waived our consideration of this issue because it is presented for the first time on appeal. We agree. *See Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived."). More importantly, however, no evidence suggests that the trial court forced the defendant, against his will, to answer the questions posited by the preparer of the presentence report. The trial court instructed the defendant

to initiate the process of the preparation of the presentence report, a process mandated by Code section 40-35-205. *See* T.C.A. § 40-35-205(a). The Code also mandates the contents of the report, *see id.* § 40-35-207, and the trial court's consideration thereof, *see id.* § 40-35-210(b)(2). Under these circumstances, we decline to view the trial court's instruction to the defendant to begin a statutorily mandated process as an act overbearing the defendant's will and forcing him to provide self-incriminating information. The defendant was represented by counsel, and, as the record indicates via the full *Momon* colloquy undertaken before the defendant testified at trial, the defendant was fully aware of his right to remain silent. Additionally, the defendant does not assert that he did not voluntary answer the questions posed of him. In support of his argument, the defendant directs our attention to *Mitchell v. United States*, 526 U.S. 314, 316-17 (1999), wherein the Supreme Court ruled that neither a defendant's guilty plea nor statements at the plea colloquy function as a waiver of the right to remain silent at sentencing and that the sentencing court cannot draw an adverse inference from a defendant's silence in determining the facts relating to the circumstances and details of the crime. In our view, citation of *Mitchell* under these circumstances is inapt because it dealt with the trial court's improper use of a defendant's silence and not the trial court's use of voluntary statements made as part of the sentencing process. *Mitchell*, in other words, did not disturb the principle that the Fifth Amendment privilege against self-incrimination is not self-executing, and an individual must claim the privilege against self-incrimination in response to specific questions if he desires the protection of the privilege. *See generally Roberts v. United States*, 445 U.S. 552, 559 (1980). In consequence, we find no merit to the defendant's claim.

Turning to the propriety of the denial of judicial diversion in this case, we conclude that the record contains "substantial evidence to support the trial court's decision" and affirm the denial. The record supports the trial court's conclusion that the defendant's spate of criminal activity and continued drug usage reflected poorly on his amenability to correction. The defendant committed other crimes after the offense in this case and had multiple brushes with the law prior to the offense, albeit for minor infractions. The record also supports a determination that these factors outweighed each of the factors in favor of a grant of diversion.

*Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-22-